UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

WELLS FARGO INSURANCE SERVICES
USA, INC.,

                Plaintiff,

v.

KYLE KING and SHERMAN INSURANCE
AGENCY, INC.,

                Defendants.

Case No. 15-CV-4378 (PJS/JJK)

ORDER

---

Randall E. Kahnke, Kerry L. Bundy, Isaac B. Hall, and Staci L. Perdue, FAEGRE BAKER DANIELS LLP, for plaintiff.

Christopher J. Harristhal and Daniel J. Ballintine, LARKIN HOFFMAN DALY & LINDGREN, LTD., for defendants.

Defendant Kyle King is a former employee of plaintiff Wells Fargo Insurance Services USA, Inc. ("WFI").  King now works for defendant Sherman Insurance Agency, Inc. ("Sherman"), a competitor of WFI.  WFI brings this action against King and Sherman, alleging that King has breached non-solicitation and confidentiality agreements, that Sherman tortiously interfered with those agreements, and that King and Sherman have misappropriated WFI's trade secrets.

This matter is before the Court on WFI's motion for a preliminary injunction.  For the reasons that follow, the motion is denied.

I.  BACKGROUND

King began working for Acordia of Minnesota, Inc. ("Acordia") in 1996.  King

Aff. ¶ 2.  In 1998, when King became a sales representative, he signed an "Employment

and Non-Piracy Agreement" ("the Agreement") with Acordia.  King Aff. ¶ 2 & Ex. A.

The Agreement restricts King's ability to sell to Acordia customers for two years after

his employment ends and prohibits King from using or disclosing Acordia's

confidential and proprietary information at any time during or after his employment.

King Aff. Ex. A ¶¶ 6-7.

The Agreement also contains detailed provisions for calculating King's

commissions as well as a dispute-resolution mechanism.  King Aff. Ex. A at 6 & ¶ 13.

Specifically, either party may give written notice to the other of a dispute, and then the

parties must meet within 20 days to attempt to settle the dispute.  King Aff. Ex. A

¶ 13(a).  If the parties fail to settle the dispute within 60 days of the written notice—or if

they fail to meet within 20 days—either party may demand arbitration.  King Aff. Ex. A

¶ 13(a).  The Agreement may not be amended except by written agreement of the

parties.  King Aff. Ex. A ¶ 11.

WFI (or one of WFI's corporate predecessors) acquired Acordia in 2001, at which

time King became an employee of WFI.  *Compare* King Aff. ¶ 4 *with* Paulnock Supp.

Decl. ¶ 6.  WFI asserts that it also acquired Acordia's rights under the Agreement

through a series of mergers, Paulnock Decl. ¶ 8, Paulnock Supp. Decl. ¶ 9, but King

contends that WFI has never offered proof that it has succeeded to Acordia's rights

under the Agreement (whether through assignment or otherwise).  Curiously, however,

King has always insisted that WFI succeeded to Acordia's *obligations* to him under the

Agreement.

Sometime in late 2014, WFI told King that it planned to reduce his compensation.

King Aff. ¶ 5 & Ex. B.  King responded that such a reduction without his consent would

breach the Agreement.  King Aff. Ex. B.  In May 2015, WFI proposed a new

compensation system to King and his fellow sales executives.  Under the proposal, the

sales executives would no longer be eligible for credited commissions on any personal-

lines revenue; effective immediately, business-development officers would work with

sales executives only on prospects with expected annual revenue of $10,000 or more;

effective August 1, 2015, new business with less than $5,000 in annual revenue for

related accounts would no longer be eligible for credited commissions; and effective

October 1, 2015, sales executives would no longer be eligible for credited commissions

on any new accounts below $10,000 in annual revenue.  King Aff. ¶ 6 & Exs. C, D.

King again responded that such changes in his terms of employment without his

consent would violate the Agreement.  King Aff. Ex. E.  In response, WFI began asking

King to sign a new contract and told him that, if he did not, he would be fired, and WFI

would enforce the restrictive covenant in the Agreement.  King Aff. ¶¶ 7-10 & Exs. F, G. WFI proposed that, if King would sign the new contract and give up commissions on smaller accounts, WFI would pay King a one-time "transition" payment estimated to be $42,000, as well as a one-time payment of 10 percent of his annual compensation.  King Aff. ¶ 18 & Exs. F, J.  King alleges that WFI told him not to discuss these proposed payments with other WFI employees.  King Aff. ¶ 22.

King continued to assert that the proposed changes would violate the Agreement and gave written notice under ¶ 13 of the Agreement requesting a meeting to settle the parties' dispute.  King Aff. ¶ 11.  WFI did not meet with King, but told him that internal partners were deciding what to do.  King Aff. ¶ 11.

While he was employed by WFI, King earned about two-thirds of his commissions through policies underwritten by Great West Casualty Company Insurance ("Great West").  King Aff. ¶ 16.  On October 29, 2015, the deputy general counsel of Great West wrote a letter to WFI stating that, due to misrepresentations by WFI and WFI's plan to move Great West's accounts away from licensed insurance representatives, Great West was inclined to discontinue its relationship with WFI.  King Aff. ¶ 16.  The letter also stated that the proposed changes would breach the contract between WFI and Great West and that Great West might report WFI to the Minnesota Commissioner of Commerce.  King Aff. ¶ 16.

By December, it was becoming clear that King would be terminated due to his refusal to sign a new contract with WFI.  *See* King Aff. Ex. K.  King was supposed to travel to Iowa for a meeting with Great West on December 7.  On December 6, King told his manager that he would be "truthful[]" with Great West about how the proposed changes would affect the handling of Great West's business and about King's pending termination.  King Aff. Ex. L.

King was fired the next day and began working for Sherman soon after.  King alleges that he has not been paid the commissions that he earned during his last quarter of employment despite his written demand.  King Aff. ¶ 14.  King also alleges that WFI breached the Agreement by failing to pay him commissions on two deals that he generated in 2014 and 2015 and by paying him quarterly rather than monthly.  King Aff. ¶¶ 12-14.

## II.  ANALYSIS

### A.  Standard of Review

A court must consider four factors in deciding whether to grant a preliminary injunction:  (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant if the injunction is not granted; (3) the balance between that harm and the injury that granting the injunction will inflict on the other parties; and (4) the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.

1981).  Preliminary injunctions are extraordinary remedies, and the party seeking such

relief bears the burden of establishing its entitlement to an injunction under the

*Dataphase* factors.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

*B.  Likelihood of Success*

1.  Breach of Contract and Tortious Interference with Contract

WFI alleges that King breached the Agreement by soliciting WFI customers.  WFI

further alleges that, by intentionally and actively encouraging King to violate the

restrictive covenant in the Agreement, Sherman has tortiously interfered with its

contractual relationship with King.

King (and Sherman) do not deny that King has solicited WFI customers on

Sherman's behalf or that this conduct violates the terms of the Agreement.  Instead,

King raises a number of defenses to the enforceability of the Agreement.  Specifically,

King contends that (1) WFI lacks standing to enforce the Agreement; (2) the doctrine of

"unclean hands" precludes enforcement of the Agreement; (3) WFI has materially

breached the Agreement, thereby excusing King's performance; (4) WFI has waived the

restrictive covenant by failing to enforce it against other employees; and (5) WFI

impermissibly attempted to use the restrictive covenant, not to protect its legitimate

business interests, but to coerce King into signing a less-favorable contract.  The Court

considers each argument in turn.

*a. Standing*

King argues that WFI lacks standing to enforce the Agreement because when he signed the Agreement, he was employed by Acordia, not WFI.  WFI responds that, as a result of a series of mergers, it is the successor company to Acordia, and it acquired Acordia's rights by virtue of Minn. Stat. § 302A.641, subd. 2(d).  *See Loving & Assocs., Inc. v. Carothers*, 619 N.W.2d 782, 785 (Minn. Ct. App. 2000) (upon a merger, "the surviving organization inherits the rights and privileges of the constituent organizations and becomes responsible for their liabilities and obligations").  King replies that (1) WFI has not offered sufficient evidence that it is the successor by merger to Acordia and (2) in any event, the Agreement cannot be assigned or otherwise transferred to WFI without his consent.

The Court finds that WFI is likely to prevail on the issue of standing.  The Court wishes that WFI had created a more robust factual record regarding the series of transactions that led to its acquisition of Acordia's rights under the Agreement.  But WFI has submitted the affidavit of Jason Paulnock, the managing director of WFI's Minnesota office, and Paulnock provides some information concerning those transactions.  Paulnock Supp. Decl. ¶¶ 6-9.  Also, it is highly unlikely that WFI is misleading the Court about this issue.  Presumably, the transactions described by Paulnock are matters of public record, and it appears that everyone—including

King—has been treating WFI as the successor to Acordia's rights and obligations for many years. All indications are that WFI will be able to prove that it succeeded to Acordia's rights and obligations under Minn. Stat. § 302A.641.

The question of whether King's consent was required to effect the transfer of the restrictive covenants in the Agreement to WFI is more difficult. In *Saliterman v. Finney*, the Minnesota Court of Appeals held that "a covenant not to compete in an employment agreement is assignable ancillary to the sale of a business to protect the goodwill of that business." 361 N.W.2d 175, 178 (Minn. Ct. App. 1985).[1] The court went on to find, however, that the employee in that case had consented to the assignment. *Id.* As a result, judges in this District have disagreed over whether *Saliterman* requires employee consent for an assignment of a noncompete agreement to be effective. *Compare Metro Networks Commc'ns Ltd. P'ship v. Zavodnick*, No. 03-6198, 2003 WL 22959680, at *5 (D. Minn. Dec. 12, 2003) (holding that *Saliterman*'s analysis of consent was dicta and that consent is not required) *with Great Am. Leasing Co. v. Dolan*,

--------

[1]Strictly speaking, the issue here is not whether a restrictive covenant may be assigned, but rather whether it is transferred by operation of law under Minn. Stat. § 302A.641, subd. 2(d). *See Papes v. CitiMortgage, Inc.*, No. A12-1094, 2013 WL 2149883, at *3 (Minn. Ct. App. May 20, 2013) ("a merger operates as a transfer of assets by operation of law rather than assignment"). Given that the Minnesota Court of Appeals has held that restrictive covenants may be assigned, the Court can conceive of no reason why the transfer of a restrictive covenant by operation of law under § 302A.641 is not also permissible. The only question is whether, in either circumstance, the employee's consent is required.

No. 10-4631, 2011 WL 334829, at *5 (D. Minn. Jan. 31, 2012) (predicting that the

Minnesota Supreme Court would find an assignment of a noncompete agreement void

unless the agreement expressly permitted assignment) *and Inter-Tel, Inc. v. CA*

*Commc'ns, Inc.*, No. 02-1864, 2003 WL 23119384, at *3-4 (D. Minn. Dec. 29, 2003) (under

*Saliterman*, unless the contract expressly provides for assignment, it is likely not

assignable).

The *Saliterman* opinion is difficult to parse, and both readings of *Saliterman* are

reasonable.  The Court finds it more likely, however, that *Saliterman's* two holdings—

that restrictive covenants are assignable and that the employee in that case had

consented to the assignment—are meant to be separate and independent bases for the

court's ruling.  The structure of the opinion treats the two issues separately, and

nowhere in *Saliterman* does the court actually say that employee consent is required.  If

employee consent was crucial (as King contends), one would expect the court to have

said that explicitly.  Moreover, this Court's reading of *Saliterman* finds support in *BFI-*

*Portable Services, Inc. v. Kemple*, No. C5-89-1172, 1989 WL 138978 (Minn. Ct. App.

Nov. 21, 1989), in which the Minnesota Court of Appeals relied on *Saliterman* to find an

assignment valid without saying a word about employee consent.  *See id.* at *2.

Even if consent is necessary, a jury would likely find that King did in fact

consent.  King repeatedly insisted that WFI had obligations to him under the

Agreement—and King repeatedly complained that WFI's proposed changes to his

compensation structure would breach the Agreement—and King did so with apparent

knowledge of the change in corporate structure.  *See* King Aff. Exs. B, E.  A jury is likely

to find that King consented to WFI's assumption of both rights and obligations under

the Agreement.  King contends that, under the Agreement, his consent was required to

be in writing, but in Minnesota such a requirement can itself be waived.  *See Larson v.*

*Hill's Heating & Refrigeration of Bemidji, Inc.*, 400 N.W.2d 777, 781 (Minn. Ct. App. 1987)

("a written contract can be varied or rescinded by oral agreement of the parties, even if

the contract provides that it shall not be orally varied or rescinded").

King also argues that, even if assignment or transfer under § 302A.641 without

consent is theoretically permissible, it should not be permitted when the transfer would

greatly enlarge the scope of the restrictive covenant, which he contends is the case here.

As the Court noted, however, a jury will likely conclude that King consented to the

transfer, which would mean that King also consented to the increased scope of his

obligation.

### b.  Unclean Hands

King contends that WFI has violated several laws during its long relationship

with King, and that the doctrine of "unclean hands" therefore precludes enforcement of

the Agreement.  Specifically, King contends that WFI has violated the Minnesota

Whistleblower Act, the National Labor Relations Act ("NLRA"), Minn. Stat. § 181.172,

and various Minnesota statutes governing the payment of wages.[2]  The Court believes

that WFI is likely to prevail against King's "unclean hands" defenses.

It is beyond doubt that an employer may enforce a restrictive covenant against

an employee even when the employer terminated the employee without cause.  *See*

*Granger v. Craven*, 199 N.W. 10, 14 (Minn. 1924).  A wrongful termination, however, may

preclude the enforcement of a restrictive covenant.  *Edin v. Josten's, Inc.*, 343 N.W.2d 691,

694 (Minn. Ct. App. 1984).

King's whistleblower claim is premised on the contention that WFI fired him in

retaliation for complaining that WFI's proposed changes to his compensation would

violate his contract and because King told WFI that he would be "truthful[]" with  Great

West about WFI's handling of its business.

The record currently before the Court, however, suggests that there is no causal

connection between these events and King's termination; instead, all of the evidence in

the record suggests that King was terminated because he refused to sign a new contract,

---

[2]King also contends that WFI's unilateral reduction to his compensation
invalidates the Agreement.  *See Sempris, LLC v. Watson*, No. 12-2454, 2012 WL 5199582,
at *3 (D. Minn. Oct. 22, 2012) (suggesting that a "change in compensation without
bargaining may invalidate the Non-Compete Agreement").  This argument plainly fails
because WFI never actually implemented its proposed changes to King's compensation.
Paulnock Supp. Decl. ¶ 11.

-11-

which is not protected conduct under the Whistleblower Act.[3]  *See Kidwell v. Sybaritic,*

*Inc.*, 749 N.W.2d 855, 864 (Minn. Ct. App. 2008) (to prevail under Whistleblower Act,

plaintiff must prove a causal connection between his protected conduct and an adverse

employment action).  King began complaining about the proposed changes to his

compensation at least *a year* before he was terminated, *see* King Aff. Ex. B, and by the

time that King said anything about Great West, he had already been told that his

termination was imminent, *see* King Aff. Ex. L (December 5 email from WFI stating that

there would be a meeting "to discuss your departure" the following week).  *Cf. Clark*

*Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam) ("proceeding along lines

previously contemplated, though not yet definitively determined, is no evidence

whatever of causality"); *EEOC v. Prod. Fabricators, Inc.*, 763 F.3d 963, 973 (8th Cir. 2014)

(no causal connection between protected activity and termination that occurred a year

later).  In addition, King's comment to WFI that he would be "truthful[]" with Great

West does not appear to be conduct protected under the Whistleblower Act.  *See* Minn.

Stat. § 181.932, subd. 1(1) (requiring a report to an employer or governmental body of a

violation, suspected violation, or planned violation of law).

------

[3]As discussed below, King was an at-will employee.  Consequently, although
WFI was bound to compensate King according to the terms of the Agreement for
business that King generated while the Agreement was in effect, WFI could, without
breaching the Agreement, choose to terminate King rather than continue to employ him
on those terms.

King also argues that, by telling him not to disclose WFI's offer to compensate him in exchange for signing a new contract, WFI violated the NLRA, 29 U.S.C. § 157, and Minn. Stat. § 181.172. WFI contends that these statutes only apply to disclosures of "wages" and that the proposed payments were not part of King's "wages." With respect to the NLRA, at least, the text of the statute does not support WFI's argument (even assuming that WFI is correct that the proposed payments were not "wages"). But King does not contend that he was terminated or suffered any other adverse action as a result of a violation of the NLRA or § 181.172. Consequently, even if WFI violated the law by telling King not to disclose these proposed payments, that violation is unlikely to preclude WFI from being able to enforce the restrictive covenants in the Agreement. *See Prow v. Medtronic, Inc.*, 770 F.2d 117, 121-22 (8th Cir. 1985) (employer's alleged misconduct did not prevent enforcement of restrictive covenant because "even assuming *arguendo* Medtronic's actions were inequitable, such misconduct must bear some relation to the merits of the case").

Finally, King argues that WFI has unclean hands because it breached his contract and violated Minnesota law by (1) failing to pay commissions to which he is entitled; (2) failing to pay him his final commissions within 24 hours after his written demand, in violation of Minn. Stat. § 181.13; and (3) paying him quarterly instead of monthly. Again, however, these alleged breaches have nothing to do with King's termination; an

employer does not render itself permanently unable to enforce a restrictive covenant

merely by breaching some law in some way at some time during the employment

relationship.  Setting that aside, the Court is in no position to predict whether King is

likely to succeed on these defenses.  Determining their merits will require both

construction of the parties' contract and a great deal of evidence that is not in the

record, such as a detailed accounting of King's compensation and information about the

transactions for which King contends he is owed commissions.[4]  At this stage, therefore,

the Court finds that WFI has established a likelihood of success regarding King's

unclean-hands defense.

### c.  Material Breach

King next contends that WFI's prior breaches of the Agreement relieve him of the

obligation to comply with it.  *See Marso v. Mankato Clinic, Ltd.*, 153 N.W.2d 281, 290

(Minn. 1967) (employer's material breaches of contract entitled employee to rescind the

contract and ignore restrictive covenant).  As just explained, however, the Court cannot

predict, one way or the other, which side is likely to prevail on King's allegations that

---

[4]WFI asserts that King was paid a draw on his future commissions every two weeks and that, once per quarter, WFI would reconcile its books and make up any difference that was owed.  *See* Paulnock Supp. Decl. ¶ 10.  Determining whether WFI was ever in breach of its contractual obligation to pay King monthly—as well as whether WFI has failed to pay commissions that King was owed for his last quarter of work—will require comparing King's draw with an accounting of the amount and timing of the commissions he was owed.

WFI breached the Agreement.  It is King's burden to show a likelihood of success on this defense to the contract; he has failed to do so.  *Cf. Webb Publ'g Co. v. Fosshage*, 426 N.W.2d 445, 449 (Minn. Ct. App. 1988) (noting the defendant's failure to establish a likelihood of success on his defense that the plaintiff had previously breached the contract).  Moreover, the Court believes that it is highly unlikely that an apparently good-faith dispute over the amount of King's commissions would cause WFI to forfeit all of its contract rights.  *Cf. Hruska v. Chandler Assocs., Inc.*, 372 N.W.2d 709, 715-16 (Minn. 1985) (employer's failure to pay compensation to which employee was entitled did not bar enforcement of restrictive covenant where employee sought to enforce other provisions of the contract and the breach did not force employee to resign).

### d.  Waiver

King next contends that WFI has waived the protection of the Agreement because it has failed to enforce the restrictive covenant against other departing employees.  Specifically, King asserts that he was told that three employees of WFI have been (or, in one case, will be) permitted to write accounts for their customers after leaving WFI.  King Aff. ¶¶ 20-21.  WFI asserts that, to the contrary, it initiated legal action against two of the employees and has reserved all of its rights against the third, who is still employed with WFI.  Paulnock Supp. Decl. ¶ 26.

Waiver is the intentional relinquishment of a known right.  *White v. City of Elk River*, 840 N.W.2d 43, 51 (Minn. 2013).  King relies on *Surgidev Corp. v. Eye Technology, Inc.*, 648 F. Supp. 661 (D. Minn. 1986), *aff'd*, 828 F.2d 452 (8th Cir. 1987), to contend that an employer's failure to enforce a restrictive covenant against other employees may result in a waiver of its rights to enforce it against any employee.  *Surgidev* is easily distinguishable, however, both because it was decided under California law and because the evidence in that case "overwhelmingly" established that the employer had permitted *dozens* of other employees to violate its restrictive covenant.  *Id.* at 697-98. Nothing in the current record would allow a court to find that WFI intentionally waived its right to enforce the restrictive covenant in its agreement with King.

### e.  Coercion/Lack of Legitimate Interest

Finally, King contends that WFI is unlikely to prevail because, in attempting to enforce the restrictive covenant, it is not seeking to protect a legitimate business interest, but is instead attempting to coerce King into signing a less-favorable contract.

This is a puzzling argument.  King was an at-will employee of WFI; the Agreement stated explicitly that the employment relationship was "not for any fixed term or duration" and that King's employment could be terminated "at any time and for any reason, with or without cause."  King Aff. Ex. A § 3.  As a result, the Agreement's compensation provisions did not give King a contractual right either to

permanent employment or to future commissions that he had not yet earned.  Instead, those provisions simply ensured that, so long as King worked for WFI, he would be paid a specified amount in commissions for business that he generated while the Agreement was in effect.

There can be no dispute, then, that WFI had the right to terminate King if it no longer wanted to pay him according to the compensation provisions in the Agreement. Given that WFI had the right to *fire* King if it did not want to continue to compensate him as required by the Agreement, the Court has difficulty understanding how it could be a breach of the Agreement—or unlawful coercion—for WFI to offer King the less drastic alternative of continuing his employment for reduced compensation.  The logical implication of King's position is that WFI had only two options—(1) firing King or (2) continuing to pay him compensation that WFI had concluded was excessive—and that WFI was legally prohibited from even proposing a third option that might have been more to the liking of both parties.  It is hard to believe that any Minnesota court would so hold.

King cites *Eutectic Welding Alloys Corp. v. West*, 160 N.W.2d 566 (Minn. 1968), for the proposition that an employer may not use a restrictive covenant to prevent employees from departing and force them into less-favorable contracts.  Although *Eutectic* contains broad language about the permissible purposes and limitations of

restrictive covenants, the actual holding in that case rested on the court's finding that the employer "had unreasonably extracted from defendant a commitment far broader than his actual functions and status could reasonably require." *Id*. at 570.  In other words, the court simply found the restrictive covenant to be unreasonably broad.  In this case, King does not attack the scope of the restrictive covenant or contend that it is broader than necessary to protect WFI's legitimate interest in protecting its good will. The Court therefore does not find *Eutectic* to be particularly helpful.

That said, there is some loose language in old cases that could be read to support the notion that the employer's subjective intent in enforcing a restrictive covenant may affect a court's willingness to enforce it.  *See Prow v. Medtronic, Inc.*, 770 F.2d 117, 112 (8th Cir. 1985) (rejecting employee's unclean-hands argument because "[t]he instant case is not one where an employer, for less than noble reasons, fires an employee, secure in the knowledge that a post-employment restrictive covenant prohibits the employee from pursuing his or her chosen vocation"); *Bennett v. Storz Broad. Co.*, 134 N.W.2d 892, 900 (Minn. 1965) (noting "plaintiff's contention that defendant used the restrictive condition in the contract to prevent him from improving his earnings or establishing his career").  But the Court does not read these cases to go so far as to hold that, under Minnesota law, the enforceability of a restrictive covenant turns on the subjective motivation of the employer.  If that were the law, then the Court would

-18-

expect to see the issue frequently litigated in the large number of restrictive-covenant cases that are filed in this District.  The Court would also expect to see the issue frequently discussed in the many decisions of the Minnesota appellate courts regarding the enforcement of restrictive covenants.  And yet the issue seems rarely to arise.

For these reasons, the Court finds that WFI is virtually certain to succeed on its claims that King breached—and that Sherman tortiously interfered with—the restrictive covenant in the Agreement, and the Court finds that WFI is likely to succeed on its claim that the restrictive covenant is valid and enforceable.

## 2.  Trade Secrets and Confidentiality

WFI also alleges that King has disclosed confidential information in violation of the Agreement and that King and Sherman have misappropriated WFI's trade secrets in violation of Minn. Stat. § 325C.01 et seq.  The evidence to support these assertions is, however, quite thin.  There is no evidence that King has in his possession any documents or other tangible things that contain WFI's trade secrets or confidential information.  Nor is there any evidence that King has used any of the "marketing strategies, performance metrics, . . . and individualized client insurance needs and histories" that WFI identifies as confidential and protected.  *See* Paulnock Decl. ¶ 5; *Reliastar Life Ins. Co. v. KMG Am. Corp.*, No. A05-2079, 2006 WL 2529760, at *5 (Minn. Ct. App. Sept. 5, 2006) ("[m]erely possessing trade secrets and holding a comparable

position with a competitor does not justify an injunction" (citation and quotations omitted)).

Essentially, WFI argues that King *must* have used confidential information because he has been in contact with WFI's customers.  Because "confidential information" is defined to include "customer names" and "customer contact information," WFI says, King necessarily violated his confidentiality obligations.  *See* King Aff. Ex. A § 7 (Agreement's confidentiality provision).

The Court does not agree.  WFI has offered no evidence that the names and contact information of its customers are not readily ascertainable by lawful means.  *See* Minn. Stat. § 325C.01, subd. 5 (defining "trade secret" to be information that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use").  Because there is no evidence that King could *not* have lawfully ascertained the customer names and contact information, WFI has not shown that it is likely to succeed on its breach-of-confidentiality and trade-secret claims.

### C.  Irreparable Harm

The fact that WFI is likely to prevail on the merits of its claims against King and Sherman is not sufficient to entitle WFI to a preliminary injunction.   "While the absence

of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied, a finding of a likelihood of success on the merits only justifies preliminary relief if there is a risk of irreparable harm and the balance of the factors support an injunction." *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009); *see also Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 318-19 (8th Cir. 2009) (holding that the movant must show a threat of irreparable harm to prevail on a motion for a preliminary injunction); *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (same).

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp.*, 563 F.3d at 319.  The threatened harm must be "certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (citation and quotations omitted).

WFI offers evidence that nine of its clients have moved their business to King and Sherman.  Paulnock Decl. ¶ 12.  In addition, five other clients have informed WFI of their intent to move their business.  Paulnock Decl. ¶ 12.  Two of those clients informed WFI that King had encouraged them to leave WFI and bring their business to Sherman.

Paulnock Decl. ¶ 12.  Altogether, these clients represent over 50 percent of the revenue

generated from clients with whom King worked while at WFI.  Paulnock Decl. ¶ 13.

The Court has sympathy for WFI, as it appears that King acted in blatant

violation of the Agreement and that WFI suffered harm as a result.  But the Court has

difficulty concluding that the harm was irreparable—or that an injunction will do

anything to prevent future irreparable harm.  WFI correctly points out that, under

similar circumstances, courts have found a threat of irreparable harm to the employer's

good will.  *See Webb Publ'g Co. v. Fosshage*, 426 N.W.2d 445, 448-49 (Minn. Ct. App. 1988)

(former employee's success in soliciting clients demonstrates that he had a "personal

hold" on the good will of the business).  But a few things must be borne in mind:

First, this case is about money.  No historic building is going to be destroyed.  No

toxins are going to be released into the environment.  No ship is going to leave port,

never to return.  King stole clients away from WFI, and the main harm that WFI

suffered is lost profits on the business of those clients.  By definition, lost profits are

"reparable" through money damages.

Second, it appears that WFI should easily be able to identify the lost clients and

quantify the lost profits.  This is not a case involving, say, a former employee who is

badmouthing a business in violation of a non-disparagement clause—causing real

damage to the business, but damage that is almost impossible to measure.  Presumably,

WFI can easily identify which clients followed King to Sherman and easily calculate how much profit WFI would have enjoyed on the business of those clients had they stayed. *See Novus Franchising, Inc.*, 725 F.3d at 895 (questioning whether loss of customers and customer goodwill are truly irreparable); *CDI Energy Servs.*, 567 F.3d at 403 (8th Cir. 2009) (harm that resulted from loss of customers could be remedied through damages); *Guy Carpenter & Co. v. John B. Collins Assocs., Inc.*, 179 Fed. App'x 982, 983 (8th Cir. 2006) (per curiam) ("We agree with the district court damages are an adequate remedy for any breach because clients who leave Carpenter can be identified and the damages resulting from the loss of those clients can be calculated.").

Finally, it appears that most of the harm that WFI fears has already occurred. Within days of King being fired, many of his customers had followed him out the door. As far as the record reflects, nothing prevented WFI from trying to persuade those customers to stay, and nothing now prevents WFI from trying to persuade those customers to return. Clearly, those customers do not want to do business with WFI. The Court can order King to cease doing business with those customers, but the Court cannot order those customers to return to WFI. Moreover, there is no evidence suggesting that any of those customers *would* return if the Court enters the injunction sought by WFI.

In this respect, this case closely resembles *CDI Energy Services v. West River Pumps, Inc.*, 567 F.3d 398 (8th Cir. 2009).  In that case, three employees of CDI formed a competing business and, while still employed by CDI, solicited CDI's customers to follow them to the new business.  The district court determined that CDI was almost certain to prevail on its claim that the three employees had breached their statutory duty of loyalty, but the district court nevertheless refused to issue a preliminary injunction.  The Eighth Circuit affirmed, explaining:

> The district court determined that any harm in the present case can be addressed through an award of damages because the harm to CDI, to a large extent, has already occurred.  The non-trade-secret claims rest on the possibly wrongful appropriation of CDI's clients, an act the defendants have already carried out.  As such, it is not entirely clear how injunctive relief would actually assist CDI in any manner.

*Id.* at 403.

The same is true here:  The record does not allow the Court to find, with any degree of confidence, that entry of a preliminary injunction will prevent future irreparable harm to WFI.

### D.  Balance of Harms

Although it is unclear whether entry of a preliminary injunction will help WFI *at all*, it is clear that entry of such an injunction could have a potentially devastating impact on King.  King is the sole breadwinner for his family, which includes his wife

-24-

and three young children.  King Aff. ¶ 1.  One of his children requires extensive and

expensive medical care; King estimates that he incurs approximately $30,000 per year in

out-of-pocket medical and other costs to provide that care.  King Aff. ¶ 1.  Given these

circumstances, the harm that could be inflicted on King is potentially severe.  *Cf. Edin v.*

*Josten's, Inc.*, 343 N.W.2d 691, 694-95 (Minn. 1984) (finding that the balance of harms

weighed against an injunction where the plaintiff's health had worsened and an

injunction could force him to file for bankruptcy).

WFI points out that King has extensive experience in his field and has the

backing of Sherman, an established agency.  That is true, but this appears to be a

commission-based industry, and it takes time to attract new customers.  There is no

reason to believe that, if King was barred from working with any former customer of

WFI, King would be able to earn sufficient commissions to support his family and

address his child's medical needs, at least in the near term.  Under the circumstances,

the balance of harms weighs heavily against granting an injunction.

## E.  Conclusion

Carefully weighing the *Dataphase* factors, the Court finds this to be a very close

case.  WFI has demonstrated that it is likely to succeed on the merits of its claims

against King and Sherman; the Court expects that, at some point, King and Sherman are

going to have to write a large check to WFI.  At the same time, WFI has not

demonstrated that entry of a preliminary injunction will prevent future irreparable

harm.  Moreover, entry of a preliminary injunction is likely to harm King far more than

it is likely to help WFI.  (The public interest does not weigh strongly in either direction.)

Under the circumstances, the Court will err on the side of denying the injunction and

leaving WFI to pursue its claims for damages against King and Sherman.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT plaintiff's motion for a preliminary injunction [ECF

No. 4] is DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated:  January 25, 2016                               s/Patrick J. Schiltz_____
                                                       Patrick J. Schiltz
                                                       United States District Judge